# UNITED STATES DISTRICT COURT
# FOR THE MIDDLE DISTRICT OF LOUISIANA

| | |
|---|---|
| Shawon Bernard, Santrica Pope, Phyllis V. Mercadel, Joyce Davis Sims, Charla Jo Johnson, League of Women Voters of Louisiana, League of Women Voters of Louisiana Education Fund, <br><br> *Plaintiffs*, <br><br> v. <br><br> Nancy Landry, in her official capacity as Secretary of State of Louisiana, <br><br> *Defendant*. | Civil Action No. 3:26-cv-487 |

# PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT
# OF A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION

**TABLE OF CONTENTS**

PRELIMINARY STATEMENT ................................................................................................ 1

FACTUAL BACKGROUND................................................................................................... 3

    I.  Louisiana's 2024 Congressional Map and the *Callais* Litigation................................. 3

    II.  Plaintiffs and Their Members Begin Voting in the May Primary Under the Current Congressional Map. ................................................................................................. 4

    III.  The Governor Issues an Executive Order Purporting to Halt Louisiana's May Congressional Primary During Voting, Causing Mass Confusion. ............................. 6

ARGUMENT........................................................................................................................ 9

    I.  Plaintiffs Are Substantially Likely to Succeed on Their Claims. ................................ 9

        A.  The Executive Order Violates Plaintiffs' Fundamental Right to Vote. ............ 9

        B.  The Purported Cancellation of the Congressional Primaries After Plaintiffs and Thousands of Others Have Already Voted Violates Plaintiffs' Substantive Due Process Rights........................................................ 14

    II.  Plaintiffs Will Suffer Irreparable Injury if Their Duly Cast Votes in Louisiana's Ongoing Congressional Primary Election Are Not Counted. ..................................... 17

    III.  The Balance of Equities and Public Interest Weigh in Favor of an Injunction. ......... 18

CONCLUSION.................................................................................................................... 20

## TABLE OF AUTHORITIES

### Cases

*Abbott v. League of United Latin American Citizens*,
  146 S. Ct. 418 (2025) ........................................................................................................ 2

*Anderson v. Celebrezze*,
  460 U.S. 780 (1983) ........................................................................................................ 12

*Baird v. Consolidated City of Indianapolis*,
  No. IP87-111C, 1991 WL 557613 (S.D. Ind. Apr. 25, 1991) ...................................... 18

*Bennett v. Yoshina*,
  140 F.3d 1218 (9th Cir. 1998) ....................................................................................... 14

*Bonas v. Town of North Smithfield*,
  265 F.3d 69 (1st Cir. 2001) ........................................................................................... 16

*Briscoe v. Kusper*,
  435 F.2d 1046 (7th Cir. 1970) ....................................................................................... 15

*Burdick v. Takushi*,
  504 U.S. 428 (1992) ....................................................................................................... 10

*Callais v. Landry*,
  732 F. Supp. 3d 574 (W.D. La. 2024) ............................................................................. 3

*Charles H. Wesley Education Foundation, Inc. v. Cox*,
  408 F.3d 1349 (11th Cir. 2005) ................................................................................ 2, 18

*Common Cause/Georgia v. Billups*,
  554 F.3d 1340 (11th Cir. 2009) ..................................................................................... 10

*Democratic Executive Committee of Florida v. Lee*,
  915 F.3d 1312 (11th Cir. 2019) ................................................................................ 10, 11

*Democratic National Committee v. Wisconsin State Legislature*,
  141 S. Ct. 28 (2020) ................................................................................................. 17, 19

*Duncan v. Poythress*,
  657 F.2d 691, 705 (5th Cir. Unit B Sept. 1981) .................................................. 2, 14, 15

*Dunn v. Blumstein*,
  405 U.S. 330 (1972) ....................................................................................................... 18

*Elrod v. Burns*,
  427 U.S. 347 (1976) ....................................................................................................... 17

*Fish v. Schwab*,
　957 F.3d 1105 (10th Cir. 2020) ............................................................................ 10

*Griffin v. Burns*,
　570 F.2d 1065 (1st Cir. 1978) ........................................................................ 14, 16

*Griffin v. North Carolina State Board of Elections*,
　781 F. Supp. 3d 411 (E.D.N.C. 2025) ................................................. 11, 14, 15, 16

*Harding v. Edwards*,
　487 F. Supp. 3d 498 (M.D. La. 2020) .................................................................. 2, 17

*Hoblock v. Albany County Board of Elections*,
　422 F.3d 77 (2d Cir. 2005) .................................................................................... 15

*Jiao v. Xu*,
　28 F.4th 591 (5th Cir. 2022) .................................................................................... 9

*Kostick v. Nago*,
　878 F. Supp. 2d 1124 (D. Haw. 2012) .................................................................... 18

*League of Women Voters of North Carolina v. North Carolina*,
　769 F.3d 224 (4th Cir. 2014) .................................................................................. 17

*League of Women Voters of Ohio v. Brunner*,
　548 F.3d 463 (6th Cir. 2008) .................................................................................. 16

*Louisiana v. Callais*,
　145 S. Ct. 2608 (2025) .............................................................................................. 4

*Louisiana v. Callais*,
　145 S. Ct. 434 (2024) ................................................................................................ 4

*Louisiana v. Callais*,
　No. 24-109, 2026 WL 1153054 (U.S. Apr. 29, 2026) ...................................... 1, 3, 4

*Malliotakis v. Williams*,
　146 S. Ct. 809 (2026) ................................................................................... 2, 17, 19

*Marks v. Stinson*,
　19 F.3d 873 (3d Cir. 1994) .............................................................................. 15, 18

*Merrill v. Milligan*,
　142 S. Ct. 879 (2022) ..................................................................................... 2, 13, 19

*Nken v. Holder*,
　556 U.S. 418 (2009) ........................................................................................... 9, 18

iv

*Norman v. Reed*,
      502 U.S. 279 (1992)..................................................................................... 11

*Northeastern Ohio Coalition for Homeless v. Husted*,
      696 F.3d 580 (6th Cir. 2012) ................................................................ 10, 11

*Pierce v. North Carolina State Board of Elections*,
      97 F.4th 194 (4th Cir. 2024) ......................................................................... 19

*Purcell v. Gonzalez*,
      549 U.S. 1 (2006)............................................................................... 2, 3, 12

*Reynolds v. Sims*,
      377 U.S. 533 (1964).................................................................................... 14

*Richardson v. Texas Secretary of State*,
      978 F.3d 220 (5th Cir. 2020) ....................................................................... 12

*Richardson v. Trump*,
       496 F. Supp. 3d 165 (D.D.C. 2020)............................................................ 12

*Robinson v. Ardoin*,
      86 F.4th 574 (5th Cir. 2023) ......................................................................... 3

*Robinson v. Callais*,
      144 S. Ct. 1171 (2024)............................................................ 1, 3, 13, 16, 19

*Roe v. State of Alabama By & Through Evans*,
      43 F.3d 574 (11th Cir. 1995) .................................................................. 15, 16

*Seamon v. Upham*,
      536 F. Supp. 1030 (E.D. Tex. 1982).............................................................. 18

*Southwest Voter Registration Education Project v. Shelley*,
      344 F.3d 914 (9th Cir. 2003) ....................................................................... 13

*Texas League of United Latin American Citizens v. Hughs*,
      978 F.3d 136 (5th Cir. 2020) ....................................................................... 13

*Texas v. United States*,
      384 U.S. 155 (1966).................................................................................... 14

*Toney v. White*,
      488 F.2d 310 (5th Cir. 1973) ....................................................................... 13

*United States v. Classic*,
      313 U.S. 299 (1941).................................................................................... 10

v

*United States v. Texas*,
   252 F. Supp. 234 (W.D. Tex.)........................................................................... 14

*Valley v. Rapides Parish School Board*,
   118 F.3d 1047 (5th Cir. 1997) ........................................................................ 20

*Voice of the Experienced v. Ardoin*,
   813 F. Supp. 3d 600 (M.D. La. 2025).............................................................. 12

*Vote.Org v. Callanen*,
   89 F.4th 459 (5th Cir. 2023) ........................................................................... 10

*Voto Latino v. Hirsch*,
   712 F. Supp. 3d 637 (M.D.N.C. 2024) ............................................................ 11

**Statutes**

52 U.S.C. § 20310............................................................................................... 4

Louisiana Statutes Annotated § 18:1306(C)(1) ................................................... 5

Louisiana Statutes Annotated § 18:1308(A)(1)(a)............................................... 5

Louisiana Statutes Annotated § 18:419.2 .......................................................... 18

**Rules**

United States Supreme Court Rule 44 ..................................................... 4, 12, 17

United States Supreme Court Rule 45 ..................................................... 4, 12, 17

**PRELIMINARY STATEMENT**

Plaintiffs seek immediate relief for an extraordinary deprivation of their voting rights. The Louisiana Secretary of State is seeking to nullify the votes of tens of thousands of Louisiana voters who have cast timely ballots in Louisiana's May 2026 congressional primary elections. She is attempting to do so by enforcing an Executive Order that seeks to cancel these elections mid-course. Governor Landry issued his Executive Order after Louisiana voters had already been voting by absentee ballot for weeks, and less than forty-eight hours before early in-person voting began. Without a temporary restraining order and preliminary injunction, the Individual Plaintiffs, members of Organizational Plaintiffs League of Women Voters of Louisiana and League of Women Voters of Louisiana Education Fund (collectively, "LWVLA"), and tens of thousands of other Louisiana voters that have voted in contested primary elections, will have their votes cancelled and their right to cast an effective ballot will be denied.

The Governor claims that the Supreme Court's decision in *Louisiana v. Callais*, No. 24-109, 2026 WL 1153054 (U.S. Apr. 29, 2026), justifies cancelling the congressional primaries—but not any of the other races or questions on the ballot. But this action was premature. The decision had not been sent down to the district court, the losing party is not yet out of time to seek rehearing, and the Supreme Court's stay of the district court's order finding the map was a racial gerrymander is still "in effect pending the sending down of the judgment of th[e Supreme] Court." *Robinson v. Callais*, 144 S. Ct. 1171, 1171 (2024).

Even had the Governor not misunderstood the litigation in the Supreme Court, there is no indication the Supreme Court intended for its decision to disrupt elections midstream. Such disruption is contrary to the Supreme Court's longstanding jurisprudence that cautions courts against disturbing the rules too close to an election. Just weeks ago, the author of the *Callais* majority opinion bemoaned "'[l]ate judicial tinkering' that 'can lead to disruption and to

1

unanticipated and unfair consequences for candidates, political parties, and voters, among others.'" *Malliotakis v. Williams*, 146 S. Ct. 809, 811 (2026) (Alito, J., concurring) (citation omitted). That decision came *weeks* before voting began, as have many other decisions from the Supreme Court stemming from the principle derived from *Purcell v. Gonzalez*, 549 U.S. 1 (2006), that federal courts may not disrupt a state's voting rules close to an election, much less when voters are already voting. *See, e.g.*, *Merrill v. Milligan*, 142 S. Ct. 879, 881 (2022) (Kavanaugh, J., concurring); *cf. Abbott v. League of United Latin Am. Citizens*, 146 S. Ct. 418, 419 (2025) (staying a decision that "improperly inserted itself into an active primary campaign, causing much confusion").

Because the Secretary has no valid interest in stopping an election mid-course based on a legal error or for any reason given the ongoing voting, her enforcement of the Executive Order cannot stand in light of the severe burden of the disenfranchisement of Plaintiffs and tens of thousands of others. The Secretary's enforcement not only violates Plaintiffs' fundamental right to vote, but also their substantive due process rights. The negation of tens of thousands of timely cast ballots in the middle of an election constitutes exactly the type of decision that violates "the right to be free from the purposeful decision of state officials to deny the citizens of a state the right to vote in an election mandated by law," which "jeopardize[s] the integrity of the electoral process." *Duncan v. Poythress*, 657 F.2d 691, 705, 702 (5th Cir. Unit B Sept. 1981).

This impending deprivation of Plaintiffs' fundamental right to vote causes them irreparable harm, *see Harding v. Edwards*, 487 F. Supp. 3d 498, 526 (M.D. La. 2020), and is not in the public interest, *see Charles H. Wesley Educ. Found., Inc. v. Cox*, 408 F.3d 1349, 1355 (11th Cir. 2005). This Court should grant the temporary restraining order and preliminary injunction and enjoin enforcement of the Executive Order, thereby restoring Plaintiffs' right to vote in the May congressional primary elections and restoring integrity to Louisiana's election process.

**FACTUAL BACKGROUND**

**I.    Louisiana's 2024 Congressional Map and the *Callais* Litigation.**

Louisiana enacted its current congressional map ("S.B. 8") on January 22, 2024. *See Callais v. Landry*, 732 F. Supp. 3d 574, 587 (W.D. La. 2024), *aff'd sub nom.*, *Louisiana v. Callais*, No. 24-109, 2026 WL 1153054 (U.S. Apr. 29, 2026). It did so after the Fifth Circuit Court of Appeals found, for the second time, that a group of Plaintiffs that challenged the previous congressional districting plan were likely to succeed in showing that the challenged plan resulted in discrimination against Black Louisianans in violation of Section 2 of the Voting Rights Act. *See Robinson v. Ardoin*, 86 F.4th 574, 599 (5th Cir. 2023).

Eight days later, a group of self-described "non-Black Plaintiffs" sued in federal court, alleging that the new, majority-Black voting-age population district created by S.B. 8 was an unconstitutional racial gerrymander. *Louisiana v. Callais*, No. 24-109, 2026 WL 1153054, at *8 (U.S. Apr. 29, 2026). A majority of the three-judge court agreed and enjoined S.B. 8 on April 30, 2024. *See Callais*, 732 F. Supp. 3d at 614. On May 15, 2024, the Supreme Court stayed the district court's injunction, leaving S.B. 8 in place for the 2024 elections. *Robinson v. Callais*, 144 S. Ct. 1171 (2024). It did so by applying the principle derived from *Purcell*, that court-ordered changes made too close to an election "can themselves result in voter confusion and consequent incentive to remain away from the polls," *id.* (citing *Purcell*, 549 U.S. at 4–5).

Of vital importance here, the Supreme Court gave explicit orders about when its stay of the *Callais* district court's injunction against S.B. 8 would dissolve: "In the event jurisdiction is noted or postponed, *this order will remain in effect pending the sending down of the judgment of this Court.*" *Robinson*, 144 S. Ct. at 1171 (emphasis added). Soon after, the Supreme Court did note jurisdiction in *Callais*. *Louisiana v. Callais*, 145 S. Ct. 434 (2024). After briefing and argument in the case, the Supreme Court requested supplemental briefing and re-argument. *Louisiana v.*

3

*Callais*, 145 S. Ct. 2608 (2025). And after the second round of briefing and argument, the Court rendered its decision on April 29, 2026, affirming the opinion of the district court that found S.B. 8 a racial gerrymander. *Callais*, 2026 WL 1153054.

The Supreme Court has not yet sent down the judgment to the district court. Under the Court's rules, this occurs "32 days after entry of the judgment, unless the Court or a Justice shortens or extends the time." U.S. Sup. Ct. R. 45.3. This is to protect the right of the losing party to "petition for the rehearing of any judgment or decision of the Court on the merits . . . within 25 days after entry of the judgment or decision." U.S. Sup. Ct. R. 44.1. Recognizing that the stay of the district court's injunction remains in place until the 32 days after the opinion when the judgment is sent down to the district court—the *Callais* Plaintiffs filed a motion with the Supreme Court on April 30 requesting that it immediately send down the judgment because "those 32 days could matter."[1] The *Robinson* Intervenors opposed,[2] and the Court has not yet responded.

## II. Plaintiffs and Their Members Begin Voting in the May Primary Under the Current Congressional Map.

At least forty-five days before the primary election, on or before April 1, 2026, Louisiana registrars mailed ballots for the May 2026 election, including the congressional party primaries, several ballot initiatives, and other races, to overseas voters as required under the federal Uniformed and Overseas Citizen Absentee Voting Act ("UOCAVA"). *See* 52 U.S.C. § 20310.

At least twenty days before a primary election, or on before April 25, 2026, the Secretary "deliver[ed] to the registrar in each parish in which the election is to be held the paper absentee by mail ballots, envelopes, certificates, instructions to be used in voting an absentee by mail ballot in

---

[1] Appl. For Issuance of a Copy of the Op. and Certified J. Forthwith, *Louisiana v. Callais*, Nos. 24-109, 24-110 (U.S. Apr. 29, 2026), https://perma.cc/EU25-7STL.

[2] *Robinson* Appellants' Resp., *Louisiana v. Callais*, Nos. 24-109, 24-110 (U.S. Apr. 29, 2026), https://perma.cc/72WL-K7UB.

that election," as required under state law. *See* La. Stat. Ann. § 18:1306(C)(1). Upon receipt of those materials, registrars were required to, and did, mail ballots to all eligible voters who had previously requested to vote by mail and who were qualified to do so. *See* La. Stat. Ann. § 18:1308(A)(1)(a). Thereafter, ballots were mailed upon receipt of a valid vote-by-mail request from a qualified voter. *See id.*

Many voters who received their mail ballots under these procedures have already marked and returned their ballots, including casting votes in the congressional party primary elections for the party they had selected as part of their voter registration or in their absentee ballot requests. One of these voters is Individual Plaintiff Phyllis V. Mercadel. Ex. A, Declaration of Phyllis V. Mercadel ("Mercadel Decl."). After receiving her absentee ballot, Ms. Mercadel returned it by mail in April to cast her vote in the Congressional District 2 contested primary election, which her registrar of voters received by April 19. *Id.* ¶¶ 4, 6–8. Several members of Plaintiff LWVLA also returned their absentee ballots to cast a vote in contested primary elections, including for Congressional Districts 3 and 5. Ex. B, Declaration of M. Christian Green ("Green Decl.") ¶ 24. For example, LWVLA member Brenda Roberts returned her absentee ballot on April 10, 2026, for the Congressional District 3 Democratic primary, LWVLA member Mary Leger returned her absentee ballot on April 30 for the Congressional District 5 Democratic primary, and LWVLA affiliated partner volunteer Judith Howard returned her ballot on April 13, 2026, for the Congressional District 4 Democratic primary. Green Decl. ¶¶ 24, 26.

This past Saturday, May 2, 2026, was the first day of early in-person voting for not only the party primary, but all of Louisiana's other federal, state, and local races and initiatives on the ballot. According to the Secretary's statistics, nearly 80,000 Louisianans have already cast votes in these primaries through the end of May 2, with over 42,000 votes cast absentee and over 37,000

in person on Saturday.[3] Individual Plaintiffs Shawon Bernard and Santrica Pope were two voters who cast their votes in person on May 2, 2026 in the Congressional District 2 primary election amidst much confusion. Ex. C, Declaration of Shawon Bernard ("Bernard Decl.") ¶ 4, 6; Ex. D, Declaration of Santrica Pope ("Pope Decl.") ¶¶ 4, 6. Several LWVLA members also cast votes on May 2 in congressional primaries, including in Congressional Districts 2, 3 and 6, including Plaintiff and LWVLA member Charla Jo Johnson, who voted in the Congressional District 6 Republican primary on May 2, 2026. Ex. E, Declaration of Charla Jo Johnson ("Johnson Decl.") ¶ 7; Green Decl. ¶¶ 24–25, 28.

### III. The Governor Issues an Executive Order Purporting to Halt Louisiana's May Congressional Primary During Voting, Causing Mass Confusion.

After thousands of voters returned their absentee ballots, the Secretary and the Governor worked together to attempt to nullify those votes and suspend the election. First, on April 30 the Secretary issued a press release certifying an "emergency," citing the Supreme Court's *Callais* decision, without explaining why that ruling constituted an emergency: "Pursuant to 18:401.1(B), I have certified the emergency in light of the Supreme Court ruling. This is a mandatory step prior to the Governor issuing an executive order suspending the upcoming Louisiana U.S. House races. All other races on the ballot, besides the U.S. House races, will continue as scheduled, with early voting beginning on Saturday . . . ."[4]

Just a few hours after the Secretary issued her press release, the Governor signed an Executive Order that purported to suspend the congressional primary elections set for May 16.[5]

---

[3] La. Sec'y of State, Statewide Early Voting Statistical Report 2 (2026), https://perma.cc/W5UV-4GXJ (last updated May 4, 2026).

[4] News Release, La. Sec'y of State Nancy Landry, Louisiana U.S. House of Representatives Races Suspended (Apr. 30, 2026),https://perma.cc/4XB9-WGHF.

[5] *See* Off. of the Gov., Exec. Order No. JML 26-038 (April 30, 2026), https://perma.cc/8K4G-JMVL.

6

The Executive Order asserts: "Due to the election emergency of unconstitutional maps as determined by the United States Supreme Court in *Louisiana v. Callais et al.*, the closed party primary elections for the offices of representative in the United States Congress are hereby suspended for the duration of the May 16, 2026 and June 27, 2026 election cycles and until July 15, 2026 or until such time as determined by the Legislature."[6] The Executive Order continues, "The Legislature is hereby encouraged to pass legislation to enact new Congressional maps and schedule those elections as soon as practical, including laws governing qualification of candidates, in order to conduct the November 3, 2026 election."[7]

The Governor issued this Executive Order after thousands of Louisianans—including the Individual Plaintiffs and Plaintiffs' members—had already cast their absentee ballots selecting their choice of congressional representative in the primary and less than two days before early voting began.[8] As described above, Individual Plaintiffs and LWVLA members were among the nearly 80,000 people who have already voted. *See supra* Factual Background § II. They understand their votes will be nullified if the Governor's Executive Order remains in force. *See* Pope Decl. ¶¶ 7; Bernard Decl. ¶¶ 7. Some LWVLA members also voted early in person and selected a congressional representative for the primary, which has led them to express concerns that their votes will be nullified by the Governor's Executive Order. *See* Green Decl. ¶¶ 27, 30–31; Johnson Decl. ¶¶ 8–10. Given the late date of the Executive Order, neither absentee ballots nor in-person ballots have been changed, and all ballots still include the congressional primary election, where

---

[6] Exec. Order No. JML 26-038 at 2.

[7] *Id.*

[8] La. Sec'y of State, Statewide Early Voting Statistical Report 2 (2026), https://perma.cc/W5UV-4GXJ (last updated May 4, 2026).

multiple candidates are running for office. Congressional candidates have continued to campaign, including candidates in Louisiana's Congressional District 5.[9]

Individual Plaintiffs are among those who experienced and witnessed confusion because of the Governor's sudden and unprecedented Executive Order. *See* Pope Decl. ¶ 8; Bernard Decl. ¶¶ 8–9. The LWVLA too has members who expressed confusion about the effect of the Governor's late-breaking Executive Order. *See* Green Decl. ¶¶ 27, 29–31; Johnson Decl. ¶ 8. Additionally, voters throughout the state have expressed to LWVLA, a trusted source for voter education, confusion about whether the elections are still occurring and what will appear on the ballot. Green Decl. ¶¶ 16, 29; Johnson Decl. ¶ 8. At early voting sites in the Baton Rouge area, numerous voters expressed confusion about the situation, but many cast ballots in the congressional race in the hope that their vote would be counted. Johnson Decl. ¶ 7.[10] Voters in Orleans Parish expressed confusion as well, as the Secretary's actions conflicted with what voters saw on their ballots. Bernard Decl. ¶¶ 8–9. And the president of a Louisiana civil rights organization reported that people kept calling them, many wondering if all of the races in the election had been cancelled rather than just the congressional primaries.[11]

This state of confusion and disillusionment extended to candidates and officials from both parties, with Senator Bill Cassidy decrying that "[t]he way that the election has transpired, that has

---

[9] *See also* Julie O'Donoghue, *Louisiana's US House candidates in limbo continue their campaigns*, LA. ILLUMINATOR (May 3, 2026), https://lailluminator.com/2026/05/03/louisiana-house-candidates.

[10] *See* Julie O'Donoghue, *Louisiana early voting kicks off with confusion over election changes*, LA. ILLUMINATOR (May 3, 2026), https://lailluminator.com/2026/05/03/early-voting-3/; Emily Cochrane, et al., *'A Huge Mess': Delayed Louisiana Primaries Stoke Confusion at Ballot Box*, N.Y. TIMES (May 2, 2026), https://www.nytimes.com/2026/05/02/us/politics/louisiana-voting-confusion-court.html.

[11] Emily Cochrane, et al., *'A Huge Mess': Delayed Louisiana Primaries Stoke Confusion at Ballot Box*, N.Y. TIMES (May 2, 2026), https://www.nytimes.com/2026/05/02/us/politics/louisiana-voting-confusion-court.html.

almost treated the voter with disrespect," and is "confusing to voters."[12] Similarly, Louisiana Republican strategist Lionel Rainey III called the fallout from the Executive Order "a huge mess" and "a nightmare scenario for election officials," adding that "there is going to be unquestionably mass confusion at the polls."[13] One candidate explained that he did not receive word about the suspension of the primary until "less than a day before early voting started," but also "received an email from the secretary of state's office saying his name would still appear on the ballot but votes for him would not be counted."[14] Another candidate told voters that "[e]ven though the governor is telling you those races have been suspended, if you see my name on the ballot, vote for me."[15]

## ARGUMENT

To obtain a preliminary injunction or temporary restraining order, the movant must establish four elements: "(1) a substantial likelihood of success on the merits, (2) a substantial threat of irreparable injury if the injunction is not issued, (3) that the threatened injury if the injunction is denied outweighs any harm that will result if the injunction is granted, and (4) that the grant of an injunction will not disserve the public interest." *Jiao v. Xu*, 28 F.4th 591, 597–98 (5th Cir. 2022). When the Government is the opposing party, the balance of the equities and the public interest elements merge. *Nken v. Holder*, 556 U.S. 418, 435 (2009).

### I.  Plaintiffs Are Substantially Likely to Succeed on Their Claims.

#### A.  The Executive Order Violates Plaintiffs' Fundamental Right to Vote.

"It is beyond cavil that 'voting is of the most fundamental significance under our constitutional structure.'" *Burdick v. Takushi*, 504 U.S. 428, 433 (1992) (citation omitted).

---

[12] Julie O'Donoghue, *Louisiana early voting kicks off with confusion over election changes*, LA. ILLUMINATOR (May 3, 2026), https://lailluminator.com/2026/05/03/early-voting-3/.

[13] *Id.*

[14] Julie O'Donoghue, *Louisiana's US House candidates in limbo continue their campaigns*, LA. ILLUMINATOR (May 3, 2026), https://lailluminator.com/2026/05/03/louisiana-house-candidates.

[15] *Id.*

"Obviously" included within that right to vote "is the right of qualified voters within a state to cast their ballots and have them counted at Congressional elections." *United States v. Classic*, 313 U.S. 299, 315 (1941). That fundamental right extends equally to primary elections. *Id.* at 325.

Burdens on the fundamental right to vote are evaluated under the *Anderson-Burdick* framework, which "requires courts to weigh the character and magnitude of the asserted injury against the precise interests put forward by the State, taking into consideration the extent to which those interests make it necessary to burden the plaintiff's rights." *Vote.Org v. Callanen*, 89 F.4th 459, 490 (5th Cir. 2023) (cleaned up). The scrutiny applied to a states' asserted justifications will "wax and wane with the severity of the burden imposed." *Fish v. Schwab*, 957 F.3d 1105, 1124 (10th Cir. 2020). If the burden is "severe," the challenged state action "must be narrowly drawn to advance a state interest of compelling importance." *Burdick*, 504 U.S. at 434; *Fish*, 957 F.3d at 1124; *see also Ne. Ohio Coal. for Homeless v. Husted*, 696 F.3d 580, 592 (6th Cir. 2012) ("[S]trict scrutiny applies when a state's restriction imposes 'severe' burdens." (citation omitted)). "And even when a law imposes only a slight burden on the right to vote, relevant and legitimate interests of sufficient weight still must justify that burden." *Democratic Exec. Comm. of Fla. v. Lee*, 915 F.3d 1312, 1318–19 (11th Cir. 2019) (citing *Common Cause/Ga. v. Billups*, 554 F.3d 1340, 1352 (11th Cir. 2009)).

Here, cancelling an ongoing election after Plaintiffs and tens of thousands of other voters have already cast their ballot imposes one of the most severe burdens imaginable. As the signage posted at polling places indicate,[16] implementation of the Governor's proclamation means that ballots, including those that have already been cast, will not be counted.

---

[16] Photo below comes from Emily Cochrane, et al., *'A Huge Mess': Delayed Louisiana Primaries Stoke Confusion at Ballot Box*, N.Y. TIMES (May 2, 2026), https://www.nytimes.com/2026/05/02/us/politics/louisiana-voting-confusion-court.html.



In cases where a subset of ballots is subject to invalidation, courts have held that the burden

on the right to vote is "substantial" and subject to strict scrutiny. *See, e.g.*, *Husted*, 696 F.3d at 593;

*Griffin v. N.C. State Bd. of Elections*, 781 F. Supp. 3d 411, 449 (E.D.N.C. 2025); *Voto Latino v.*

*Hirsch*, 712 F. Supp. 3d 637, 673–74 (M.D.N.C. 2024). Indeed, for voters who have already cast

a ballot, it is "hard to envision a more 'severe restriction' than retroactive invalidation of one's

vote." *Griffin*, 781 F. Supp. 3d at 449 (quoting *Norman v. Reed*, 502 U.S. 279, 289 (1992)). The

burden here is even more extreme than in those cases, in that the Executive Order effectively

invalidates the votes for Congress cast by *every* voter in Louisiana. *See Lee*, 915 F.3d at 1321

(finding "serious burden on the right to vote" because signature-match requirement was likely to

disqualify thousands of voters); *Voice of the Experienced v. Ardoin*, 813 F. Supp. 3d 600, 663

(M.D. La. 2025) (finding "severe burden" based on voting restriction's impact on "thousands of

otherwise eligible individuals"); *Richardson v. Trump*, 496 F. Supp. 3d 165, 184 (D.D.C. 2020)

("[W]here a policy creates a situation where a large number of ballots will be invalidated, and

11

consequently, not counted based on circumstances entirely out of the voters' control, the burden on the right to vote is exceptionally severe." (cleaned up)) (collecting cases); *cf. Richardson v. Texas Sec'y of State*, 978 F.3d 220, 236 (5th Cir. 2020) (finding lack of severe harm where impact is limited to "a small number of voters"). The Executive Order's blanket disqualification of every vote in an ongoing congressional election is an extraordinary intrusion on voting rights that warrants strict scrutiny.

The State cannot supply a compelling interest that justifies cancelling an ongoing election in which ballots have already been cast. Although the Executive Order claims that the current congressional districts are "unconstitutional" under *Callais*, that stated justification is premature and cannot pass muster. For one, the twenty-five days to seek rehearing of the Supreme Court's *Callais* decision has not yet lapsed, U.S. Sup. Ct. R. 44, and the Supreme Court has not yet sent down a certified copy of the decision, which occurs thirty-two days after entry of judgment, U.S. Sup. Ct. R. 45.3. Thus, as a legal matter, the ruling as to the constitutionality of Louisiana's congressional districts is not yet final, and it is not "necessary to burden" the rights of voters. *See Anderson v. Celebrezze*, 460 U.S. 780, 789 (1983).

Moreover, there is no indication that the Supreme Court intended for its ruling to immediately invalidate and enjoin the use of Louisiana's congressional map. Relying on *Purcell*, 549 U.S. at 4–5, the Supreme Court has recently allowed elections to be held even in districts it later found to violate federal law because elections were too close in time. *E.g.*, *Merrill v. Milligan*, 142 S. Ct. 879 (2022) (staying injunction against congressional map that was later found to be unlawful). As Justice Kavanaugh explained in staying an injunction against Alabama's congressional map with the beginning of voting in a primary *seven weeks away*, even "heroic

12

efforts by . . . state and local authorities in the next few weeks . . . likely would not be enough to avoid chaos and confusion." *Id.* at 880 (Kavanaugh, J., concurring).

In *Callais* itself, the Supreme Court stayed the district court's injunction that was issued on April 30, 2024, on *Purcell* grounds, many months before the next relevant election and without active primary voting occurring. *Robinson v. Callais*, 144 S. Ct. 1171 (2024). In doing so, the Supreme Court ordered that its stay of the district court decision "remain in effect pending the sending down of the judgment of this Court," *id.*, an event that has not yet occurred. "The decision to enjoin an impending election is so serious that the Supreme Court has allowed elections to go forward even in the face of an undisputed constitutional violation." *Sw. Voter Registration Educ. Project v. Shelley*, 344 F.3d 914, 918 (9th Cir. 2003) (collecting cases). Even if there is a policy reason not to proceed with the current congressional districts, that is not a basis for the Governor to usurp the Louisiana legislature's authority to set election dates or to override the Supreme Court's stay of the district court's decision enjoining the current congressional map. *See Tex. League of United Latin Am. Citizens v. Hughs*, 978 F.3d 136, 150 (5th Cir. 2020) (Ho, J., concurring) (finding it "offensive to the Constitution" to allow the governor to "suspend" election laws by executive fiat).

"The right to vote freely for the candidate of one's choice is of the essence of a democratic society," and the unilateral decision by state officials to cancel an ongoing election "strike[s] at the heart of representative government." *Toney v. White*, 488 F.2d 310, 314 (5th Cir. 1973). The cancellation of an ongoing election is a grave intrusion on voting rights, and it cannot be justified by the Secretary's enforcement of the Governor's unnecessary and premature rush to action before the Supreme Court has finally resolved *Callais*. Plaintiffs are substantially likely to prevail in

showing that the cancellation of ongoing congressional primary elections unlawfully burdens the fundamental right to vote under the *Anderson-Burdick* balancing test.

### B. The Purported Cancellation of the Congressional Primaries After Plaintiffs and Thousands of Others Have Already Voted Violates Plaintiffs' Substantive Due Process Rights.

"The right to vote freely for the candidate of one's choice," and "to have one's vote counted" is "the essence of a democratic society." *Reynolds v. Sims*, 377 U.S. 533, 554–55 (1964). Thus, the "right to vote is one of the fundamental personal rights included within the concept of liberty as protected by the due process clause." *United States v. Texas*, 252 F. Supp. 234, 250 (W.D. Tex.), *aff'd sub nom. Texas v. United States*, 384 U.S. 155 (1966).

The "due process clause of the fourteenth amendment forbids state officials from unlawfully eliminating" the "fundamental right" to vote. *Duncan*, 657 F.2d at 704. It protects voters from state officials who engage in such a "broad-gauged unfairness" that it "permeates an election, even if derived from apparently neutral action." *Griffin v. Burns*, 570 F.2d 1065, 1077 (1st Cir. 1978). Most notably, "retroactive changes to election procedures raise serious due process concerns, *particularly* where those changes result in invalidating the votes of individuals who cast ballots in reliance on previously established rules." *Griffin*, 781 F. Supp. 3d at 435. Thus, a substantive due process violation occurs in the voting context when there is: "(1) likely reliance by voters on an established election procedure"; and "(2) significant disenfranchisement that results from a change in the election procedures." *Bennett v. Yoshina*, 140 F.3d 1218, 1226–27 (9th Cir. 1998). Here, the Secretary's enforcement of an Executive Order's cancellation of the congressional primaries after voting has already begun—and while other races are still proceeding under the current schedule—bears all the hallmarks of a substantive due process violation.

*First*, the "retroactive invalidation of . . . voters' ballots violates their substantive due process rights." *Griffin*, 781 F. Supp. 3d at 444. The Fifth Circuit has long held that "substantive

14

guarantees of the due process clause" include "the right to be free from the purposeful decision of state officials to deny the citizens of a state the right to vote in an election mandated by law." *Duncan*, 657 F.2d at 705. This constitutional violation includes situations where, as here, "election officials refuse to tally absentee ballots that they have deliberately (even if mistakenly) sent to voters . . . ." *Hoblock v. Albany Cnty. Bd. of Elections*, 422 F.3d 77, 98 (2d Cir. 2005); *see also Marks v. Stinson*, 19 F.3d 873, 889 (3d Cir. 1994) (The "rejection of a ballot where the voter has been effectively deprived of the ability to cast a legal vote" in that election "implicates federal due process concerns."). As such, where "fundamental, constitutionally protected liberties are adversely affected," applying a new rule "to nullify previously acceptable" ones is "unfair and violate[s] due process." *Briscoe v. Kusper*, 435 F.2d 1046, 1055 (7th Cir. 1970).

Here, there can be no dispute that the Governor issued his Executive Order well after absentee voting had already begun in the congressional primaries and less than two days before early in-person voting began, with those primary races still on the ballot. *See supra* Factual Background § II. All the individual Plaintiffs and numerous members of Plaintiff LWVLA have cast absentee ballots or voted early in-person in contested congressional primaries. *See id*. If the Executive Order is allowed to stand, those votes will be disregarded and Plaintiffs and LWVLA members will be disenfranchised, along with thousands of other Louisiana voters.

*Second*, continued enforcement of the Executive Order will cause widespread disenfranchisement and will "jeopardize[] the integrity of the electoral process," in violation of Plaintiffs' substantive due process rights. *Duncan*, 657 F.2d at 702; *see also Roe v. State of Ala. By & Through Evans,* 43 F.3d 574, 580 (11th Cir. 1995) (finding a substantive due process violation where "plaintiffs have demonstrated fundamental unfairness" in election procedures due to a ruling that occurred after voting). There is significant "precedent for federal relief where

15

broad-gauged unfairness permeates an election, even if derived from apparently neutral action." *Griffin*, 570 F.2d at 1077.

Here, nearly *80,000* Louisianans have already voted by absentee ballot or early in-person.[17] This casting aside of thousands of duly cast votes is precisely the type of widespread disenfranchisement due to unfair, ex post facto changes to the rules of the game that courts have found make out a substantive due process violation. *See, e.g.*, *Griffin*, 781 F. Supp. 3d at 419 n.12 (issue concerning several thousand voters was significant enough for substantive due process violation); *League of Women Voters of Ohio v. Brunner*, 548 F.3d 463, 478 (6th Cir. 2008) (widespread rejection of eligible voters' ballots violated their substantive due process rights); *Roe*, 43 F.3d at 578 (issue concerning 1,000 to 2,000 voters was significant enough for substantive due process violation); *Bonas v. Town of N. Smithfield*, 265 F.3d 69, 75 (1st Cir. 2001).

The Secretary may argue that they cannot run an election under maps already enjoined by a federal court, and that these nearly 80,000 voters who have already cast ballots that will be rejected can vote in a rescheduled primary under different districts. But this mistakes the current state of play. The *Callais* district court's purported reinstatement of its injunction against S.B. 8 has no legal effect because the Supreme Court's stay of that order "remain[s] in effect pending the sending down of the judgment of this Court," *Robinson*, 144 S. Ct. at 1171—an event that has not yet occurred and will not occur until thirty-two days have passed, U.S. Sup. Ct. R. 45.3, or longer if the *Robinson* Appellants seek rehearing, U.S. Sup. Ct. R. 44.1.

Regardless of the timing of the sending down of the judgment, the Supreme Court has repeatedly warned that "when an election is close at hand, the rules of the road should be clear and settled . . . because running a statewide election is a complicated endeavor." *Democratic Nat'l*

---

[17] La. Sec'y of State, Statewide Early Voting Statistical Report 2 (2026), https://perma.cc/W5UV-4GXJ.

16

*Comm. v. Wis. State Legislature*, 141 S. Ct. 28, 31 (2020) (Kavanaugh, J., concurring). Given that the Supreme Court recently blocked a court-ordered change to an election with voting still weeks away, with Justice Alito explaining that "'[l]ate judicial tinkering' that 'can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others,'" *Williams*, 146 S. Ct. at 811 (Alito, J., concurring) (citation omitted), it would be odd for it to intend its opinion in Callais to disrupt an ongoing election with active voting as here.

*    *    *

The Secretary's enforcement of this Executive Order is odious to both the fundamental right to vote and the fundamental unfairness of having tens of thousands of voters votes retroactively denied. Accordingly, it violates the Fourteenth Amendment twice over.

## II. Plaintiffs Will Suffer Irreparable Injury if Their Duly Cast Votes in Louisiana's Ongoing Congressional Primary Election Are Not Counted.

Any loss of constitutional rights is presumed an irreparable injury. *Elrod v. Burns*, 427 U.S. 347, 373 (1976). "Courts routinely deem restrictions on fundamental voting rights irreparable injury." *League of Women Voters of N.C. v. North Carolina*, 769 F.3d 224, 247 (4th Cir. 2014) (citing cases); *see also Harding v. Edwards*, 487 F. Supp. 3d 498, 526 (M.D. La. 2020) (finding irreparable harm where there was a sufficient threat the voters' "right to vote [would be] wrongfully denied or abridged"). As detailed above, every Individual Plaintiff, many League members, and likely many of the 80,000 other voters who have already cast ballots in the primaries will face irreparable harm if their votes are not counted.

The fact that the Governor and Secretary intend to call another, later primary election under different maps offers no remedy or consolation. The Louisiana Legislature has set May 16 as the date for the congressional primary election. La. Stat. Ann. § 18:419.2. As explained above, the Supreme Court has not yet lifted its stay on the *Callais* district court's injunction against the current

17

congressional map. The promise of the ability to vote in some future, redone primary is no remedy to the denial of the right to vote in the legally required one set by the Louisiana State Legislature. Moreover, with new maps, candidates and contested primaries may well shift, and voters who cast ballots in contested primaries in this election may have primaries that are uncontested or have no candidate at all in their party's primary.

Plaintiffs have shown irreparable harm in the most extreme form: complete disenfranchisement after submitting a valid ballot.

### III.     The Balance of Equities and Public Interest Weigh in Favor of an Injunction.

When the defendant is a government actor, courts consider harm to the opposing party and weight of the public interest together. *Nken*, 556 U.S. at 435. The injury Plaintiffs face here is grave—a denial of their fundamental right to vote. *See Dunn v. Blumstein*, 405 U.S. 330, 336 (1972). Protecting "franchise-related rights is without question in the public interest." *See Charles H. Wesley Educ. Found., Inc.*, 408 F.3d at 1355. And certainly, the public interest "is not served by arbitrarily ignoring the absentee vote." *Marks*, 19 F.3d at 888.

Additionally, pulling out the rug from voters in the congressional primary but not other primaries has already caused significant voter confusion. *See supra* Factual Background § II. Delaying an election that is already in process can easily result in "voter confusion concerning both issues and candidates" and "in diminished voter participation." *Seamon v. Upham*, 536 F. Supp. 1030, 1034 (E.D. Tex. 1982); *see also Kostick v. Nago*, 878 F. Supp. 2d 1124, 1147 (D. Haw. 2012) (delaying specific election would cause "grave confusion and potential chaos at the polls," which "is directly contrary to the powerful public interest in avoiding disruption of the primary election"); *Baird v. Consol. City of Indianapolis*, No. IP87-111C, 1991 WL 557613, at *11 (S.D. Ind. Apr. 25, 1991) (postponing "the primary would . . . raise the possibility of disappointingly low voter turnout at a subsequent election").

18

Finally, the Supreme Court's "precedents recognize a basic tenet of election law: When an election is close at hand, the rules of the road should be clear and settled. That is . . . because running a statewide election is a complicated endeavor." *Democratic Nat'l Comm.*, 141 S. Ct. at 31 (Kavanaugh, J., concurring). With the 2026 primary well underway and nearly 80,000 votes already cast, "candidates and voters alike are now entitled to the stability and sense of repose that engender trust and confidence in our elections." *Pierce v. N.C. State Bd. of Elections*, 97 F.4th 194, 229 (4th Cir. 2024).

The Supreme Court's order in *Callais*, which has not yet been sent down to the district court, could not have been intended to upend an election already in progress with ballots already cast. Justice Alito, who authored *Callais*, just months ago explained that *Purcell* prevents the sort of "'[l]ate judicial tinkering' that 'can lead to disruption and to unanticipated and unfair consequences for candidates, political parties, and voters, among others.'" *Malliotakis* 146 S. Ct. at 811 (Alito, J., concurring) (citation omitted); *see also Merrill*, 142 S. Ct. at 881 (Kavanaugh, J., concurring) ("changes [must] be feasible without significant cost, confusion, or hardship"). Citing this principle, the Supreme Court stayed the lower court's order on April 30, 2024 in advance of the 2024 election. *See Robinson v. Callais*, 144 S. Ct. 1171 (2024). That same principle applies *a fortiori* when voters have already cast votes in an election.

The State certainly has no interest in conducting an election under circumstances that result in mass voter confusion and diminished turnout, based on a misunderstanding of the effect of the Supreme Court's stay and merits decision in *Callais*. And of course, because disenfranchising thousands of voters under these circumstances violates their constitutional rights, the State has no interest in enforcing such an order. Instead, "the public interest is enhanced" by ensuring that eligible citizens are entitled to cast an effective ballot, "which comports with basic protections of

19

due process to which all citizens are entitled." *Valley v. Rapides Par. Sch. Bd.*, 118 F.3d 1047, 1056 (5th Cir. 1997).

## CONCLUSION

For the foregoing reasons, a temporary restraining order and preliminary injunction enjoining implementation of the Executive Order should be granted.

Date: May 4, 2026                                        Respectfully submitted,

<table>
<tr><td>

Davin Rosborough*
Dayton Campbell-Harris*
Ming Cheung*
Sophia Lin Lakin*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
125 Broad Street, 18th Floor
New York, NY 10004
drosborough@aclu.org
dcampbell-harris@aclu.org
mcheung@aclu.org
slakin@aclu.org

Sarah Brannon*
AMERICAN CIVIL LIBERTIES UNION
FOUNDATION
915 15th St. NW
Washington, DC 20005
sbrannon@aclu.org

T. Alora Thomas-Lundborg*
Michelle Leung*
RACE & LAW CLINIC - HARVARD LAW
SCHOOL
1607 Massachusetts Avenue, 3d Floor
Cambridge, MA 02138
tthomaslundborg@law.harvard.edu
mleung@law.harvard.edu

</td><td>

/s/ *Malcolm Lloyd*_____
Malcolm Lloyd
Nora Ahmed*
ACLU FOUNDATION OF LOUISIANA
1340 Poydras St, Ste. 2160
New Orleans, LA 70112
Tel: (504) 522-0628
nahmed@laaclu.org
mlloyd@laaclu.org

Stuart Naifeh*
John S. Cusick*
Victoria Wenger*
Colin Burke*
NAACP LEGAL DEFENSE AND EDUCATIONAL
FUND, INC.
40 Rector Street, 5th Floor
New York, NY 10006
Tel: (212) 965-2200
snaifeh@naacpldf.org
vwenger@naacpldf.org
cburke@naacpldf.org

</td></tr>
</table>

*Attorneys for Plaintiffs*

*Pro Hac Vice Motion Forthcoming

20